**UNITED STATES of America**

v.

**Alfred CARONIA, Defendant.**

**No. 06–CR–229 (ENV).**

United States District Court,
E.D. New York.

Sept. 11, 2008.

Jennifer Lynn McCann, Thomas F. Liotti, Law Offices of Thomas F. Liotti, Garden City, NY, for Defendant.

## DECISION AND ORDER

VITALIANO, District Judge.

Defendant moves to dismiss the two-count misdemeanor information charging him with certain violations of the misbranding provisions of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.* The motion is denied in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Factual History*

The following facts are taken from the superseding misdemeanor information filed August 19, 2008 and, for purposes of this motion to dismiss, are accepted as true.

Orphan Medical, Inc. ("Orphan"), now known as Jazz Pharmaceutical, was a specialty pharmaceutical company focused primarily on the development of drugs to treat pain, sleep disorders, and central nervous system disorders. Orphan manufactured the drug Xyrem, a powerful sleep-inducing depressant whose active ingredient was gamma-hydroxybutryate ("GHB").[1] In July 2002, the U.S. Food and Drug Administration ("FDA") first approved Xyrem to treat cataplexy, a condition associated with narcolepsy. In November 2005, the FDA also approved Xyrem to treat excessive daytime sleepiness

---

1. On July 13, 2007, after waiver of indictment, an information was filed against Orphan charging a single count of introducing a misbranded drug into interstate commerce with intent to defraud and mislead, 21 U.S.C. §§ 331(a) and 333(a)(2), related to Orphan's marketing of Xyrem. *See* note 2, *infra.* Orphan pled guilty to the charge that same day and was sentenced. On November 21, 2007, a criminal judgment was entered requiring Orphan to pay $12,262,078 in restitution, $5 million in a criminal fine, and an assessment of $400. *See* No. 07–CR–531 (E.D.N.Y. closed Nov. 21, 2007).

("EDS") in patients with narcolepsy. Xyrem has been approved by the FDA only for these two uses, or "indications". Use of Xyrem has been associated with a number of serious potential side effects, and abuse of the drug can lead to dependence and withdrawal symptoms as well as serious medical problems including seizures, coma, and death. Overdosing on Xyrem could cause, among other things, a slow heart rate and coma. Xyrem's FDA-approved labeling contains a "black box" warning about the dangers of its side effects and possible abuse, which is the most serious warning the FDA can require to be placed on the labeling of a prescription drug. Its labeling states that Xyrem's safety and efficacy have not been established in patients under 16 years of age, that it was important to keep the drug away from children, and that there was "very limited" experience with the drug in elderly patients. Xyrem was designated a Schedule III Controlled Substance for medical use, meaning that it could not be sold, distributed or provided to anyone other than for a prescribed use.

Pursuant to the FDCA, manufacturers are restricted from marketing so-called "off-label" (i.e., non-FDA approved) uses of a drug. Such off-label marketing results in the drug being "misbranded" in violation of the statute.[2] Count one of the instant information alleges that, between March 2005 and March 2006, defendant Alfred Caronia, an Orphan sales representative, knowingly and intentionally conspired with others to misbrand a drug by marketing Xyrem for off-label uses in violation of 21 U.S.C. §§ 331(a), (k), 333(a)(1), and 18 U.S.C. § 371. Count two of the information charges Caronia with a substantive violation of misbranding a drug while it was held for sale after shipment in interstate commerce, violating 21 U.S.C. §§ 331(k) and 333(a)(1).

In particular, the information alleges that, on October 26, 2005, Caronia promoted Xyrem to a physician "John Doe" for fibromyalgia, EDS, muscle disorders, chronic pain and fatigue, which uses were for off-label indications. The information further alleges that, on November 2, 2005,

**2.** The FDCA prohibits the "introduction or delivery for introduction into interstate commerce of any food, drug, device or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a). Further, it prohibits the "alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, *or the doing of any other act with respect to*, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded." 21 U.S.C. § 331(k) (emphasis added). Pursuant to 21 U.S.C. § 352(f), a drug is "misbranded" if its labeling does not bear "adequate directions for use." FDA regulations provide that "adequate directions for use" are directions "under which the layman can use a drug safely and for the purposes for which it is intended[,]" 21 C.F.R. § 201.5, and further provide that a drug's "intended use" is determined by considering the "objective intent of the persons legally responsible for the labeling of the drugs[,]" as evidenced by the "labeling claims, advertising matter, or oral or written statements by such persons or their representatives." 21 C.F.R. § 201.128; *see also Action on Smoking and Health v. Harris*, 655 F.2d 236, 239 (D.C.Cir.1980) ("[I]t is well established that the 'intended use' of a product, within the meaning of the Act, is determined from its label, accompanying labeling, promotional claims, advertising, and any other relevant source.") (internal citations and quotation marks omitted). Consequently, if a manufacturer or its representatives promote the "off-label" use of a drug, then the drug's labeling will not bear adequate directions for the "purposes for which it is intended", and the drug will be considered to be "misbranded". A person convicted of a violation of § 331 is guilty of a misdemeanor under 21 U.S.C. § 333(a)(1) or, if it is a second violation or done "with the intent to defraud or mislead", a felony under § 333(a)(2).

Caronia introduced another physician, who was paid by Orphan, to "John Doe", and that the other physician promoted Xyrem for off-label indications, including fibromyalgia, EDS, sleepiness, weight loss and chronic fatigue.

## II. *Procedural History*

The information supersedes a prior felony indictment against Caronia and Dr. Peter Gleason, who is the physician allegedly paid by Orphan to promote Xyrem for off-label uses. That indictment charged that Gleason and Caronia participated in a conspiracy with others to introduce a misbranded drug into interstate commerce with intent to defraud and mislead, 21 U.S.C. §§ 331 and 333(a)(2), and to make false statements in connection with the delivery of and payment for health care benefits, 18 U.S.C. §§ 1035(a)(1), (2). The indictment also charged a conspiracy to defraud public and private health care plans, 18 U.S.C. § 1349.

Gleason moved to dismiss the misbranding counts of the original indictment on various grounds, including that the misbranding provisions of the FDCA were unconstitutional restrictions of his right to free speech under the First Amendment and that they were unconstitutionally vague and overbroad. Caronia joined in Gleason's motion insofar as it applied to him and separately moved to dismiss the entire indictment on other grounds as well. Briefing on those motions was completed and the motions submitted for decision on May 12, 2008. While those motions were *sub judice,* on August 8, 2008, the government filed a superseding information against Gleason charging him with a single misdemeanor misbranding violation pursuant to 21 U.S.C. §§ 331(a) and 333(a)(1). Gleason pled guilty to that charge the same day and awaits sentencing. On August 12, 2008, the government filed a superseding information against Caronia containing a similar single misdemeanor

misbranding charge. Then, on August 19, 2008, it filed this second superseding information, charging the two misdemeanor counts now at issue.

At that time, the Court requested supplemental briefing by Caronia and the government as to which portions of the original motion to dismiss still remained for the Court to determine and as to any new or modified grounds for dismissal. Recognizing the superseding information had rendered the pending motion moot, Caronia, essentially, reincorporated in the current motion Gleason's original arguments that the misbranding provisions of the FDCA as applied to the charged conduct are unconstitutional.

Procedurally, as a result of Gleason's guilty plea and the superseding information filed against Caronia, the original motions to dismiss filed by Gleason and Caronia are both denied as academic. The Court addresses now only the grounds, including those reincorporated, that Caronia raises on his new motion to dismiss.

## DISCUSSION

### I. *Standard for Dismissal*

■■■ Federal Rule of Criminal Procedure 12(b)(2) permits a criminal defendant to raise by pretrial motion "any defense, objection, or request that the court can determine without a trial of the general issue." A court faced with a motion to dismiss must ask, first, whether the information states an offense, and second, whether the information is sufficiently specific to provide notice and allow the defendant to plead double jeopardy in a subsequent case. *United States v. Kramer,* 499 F.Supp.2d 300, 305 (E.D.N.Y.2007); *United States v. Sierra–Garcia,* 760 F.Supp. 252, 258 (E.D.N.Y.1991). The court is limited to the face of the information and all the facts it alleges must be accepted as

true. *United States v. Blasius,* 230 F.Supp. 995, 997 (S.D.N.Y.1964); *United States v. Goldberg,* 756 F.2d 949, 950 (2d Cir.1985). The motion court may consider additional documents that have been submitted, but cannot give any weight to contrary factual assertions made by the defendant. *United States v. Martino,* No. S1 00 CR 389(RCC), 2000 WL 1843233, at *1 (S.D.N.Y. Dec.14, 2000).

## II. *Whether Caronia Misbranded Xyrem*

Caronia argues that the allegations in the information actually establish that he did not misbrand Xyrem within the meaning of 21 U.S.C. § 331(k) and, therefore, that count two of the information must be dismissed.

█ He first claims that, at the time the information alleges he marketed Xyrem for off-label uses, the drug was not "held for sale ... after shipment in interstate commerce" within the meaning of § 331(k). In particular, he argues that Xyrem was dispensed only via a central pharmacy in Missouri and shipped directly to the consumer—which he claims, takes it out of the scope of subsection (k). *See Kordel v. United States,* 335 U.S. 345, 351, 69 S.Ct. 106, 110, 93 L.Ed. 52 (1948) (noting that § 331(k) is "restricted to cases where the article is held for sale after shipment in interstate commerce; and, unlike [§ 331(a)], it does not reach situations where the manufacturer sells directly to the consumer."). The government counters that the proof at trial will demonstrate Xyrem was manufactured in stages in Pennsylvania and South Carolina, then shipped to a Missouri company, SDS/Express Scripts, which, during the relevant time period, acted as a warehouse, centralized pharmacy and distributor for all Xyrem prescriptions nationwide.[3] In other words, that Xyrem was "held for sale" by SDS/Express after its shipment in interstate commerce and that Caronia promoted Xyrem for off-label uses while the drug was held at SDS/Express. Since these allegations of fact must be accepted as true on the motion, the Court finds that Caronia's charged conduct falls within the plain language of 21 U.S.C. § 331(k). *See United States v. Sullivan,* 332 U.S. 689, 697, 68 S.Ct. 331, 335–36, 92 L.Ed. 297 (1948) (The purpose of the FDCA is to "safeguard the consumer by applying the Act to articles from the moment of their introduction into interstate commerce all the way to the moment of their delivery to the ultimate consumer.").

Caronia next argues that, assuming the lawful reach of the FDCA, he did not misbrand Xyrem within the meaning of 21 U.S.C. § 352(f) because he administered adequate warnings to the cooperating physician in October and November 2005.[4] Somewhat confusingly, Caronia claims that no matter whether Xyrem is prescribed for on or off-label indications, it is administered in the same manner and in the same dosage, and, therefore, the potential dangers are identical for all. Accordingly, Caronia says, his duty to provide adequate directions was satisfied when he provided the cooperating physician with the black box warning outlining the dangers and

---

**3.** The parties agree the proof will show that prescribing physicians faxed prescriptions for Xyrem to SDS/Express Scripts, which then communicated with the patient and shipped Xyrem directly to the patient's residence.

**4.** As noted, 21 U.S.C. § 352(f) provides that a drug is misbranded "[u]nless its labeling bears (1) adequate directions for use; and (2) such adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users...."

side effects of Xyrem, even if he was promoting it for off-label uses.

■■■ This argument is utterly without merit. It is well established that under the FDA's "intended use" regulations, the promotion of a drug for an off-label use by the manufacturer or its representative is prohibited regardless of what directions the manufacturer or representative may give for that use. *See, e.g., Decision in Washington Legal Foundation v. Henney,* 65 Fed.Reg. 14,286–01 (Mar. 16, 2000) (FDCA "generally prohibits the manufacturer of a new drug or medical device from distributing a product in interstate commerce for any intended use that FDA has not approved as safe and effective.... The intended use or uses of a drug or device may also be determined from advertisements, promotional material, oral statements by the product's manufacturer or its representatives, and any other relevant source."); *Final Guidance on Industry–Supported Scientific and Educational Activities,* 62 Fed.Reg. 64,074, 64,075 (Dec. 3, 1997) ("The courts have agreed with the agency that [21 U.S.C. § 352(f)(1)] requires information not only on how a product is to be used (e.g., dosage and administration), but also on all of the intended uses of a product.").[5] Stated differently, if, as the manufacturer's representative, Caronia promoted Xyrem for off-label uses, whatever information (accurate or inaccurate) Caronia may have provided in the course of the promotion of those off-label uses is irrelevant to a misbranding charge. If anything, in fact, this argument buttresses the facts set forth in the information, which the Court must accept for motion purposes as true anyway. It certainly provides no ground for relief.

■■ Caronia's third argument for dismissal is bolder still. He claims (without any support whatsoever) that warnings were unnecessary because the physician to whom he promoted off-label uses of Xyrem was a confidential informant who was not going to be a user or prescriber of the drug. Yet, as the government points out, the plain language of 21 U.S.C. § 331(k) requires only that the government show "that the [defendant] undertook some act with respect to the [drug] that [was] held for sale after shipment in interstate commerce, which act resulted in the [drug] being adulterated and misbranded." *United States v. Torigian Laboratories, Inc.,* 577 F.Supp. 1514, 1526 (E.D.N.Y.1984). It is the mouth of the promoter not the ear or intent of the audience that controls. Promotion of off-label uses by a drug manufacturer's representative clearly falls within the broad statutory definition of the offense. Even assuming *arguendo* that the cooperating physician was not, and never intended to be, a user or prescriber of Xyrem, Caronia points to no authority, and the Court is unaware of any, that would exclude his alleged promotion of Xyrem to a cooperating physician for an off-label use from this statutory prohibi-

---

5. *See also* Draft Guidance, "Good Reprint Practices for Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices," *available at* http://www.fda.gov/OHRMS/DOCKETS/ 98fr/FDA–2008–D–0053–gdl.pdf (Feb.2008) ("An approved new drug that is marketed for an unapproved use becomes misbranded and an unapproved new drug with respect to that use."); 21 C.F.R. § 201.128 (intended use may be shown by the "labeling claims, advertising matter, or oral or written statements by such persons or their representatives"); 21 C.F.R. § 202. 1(e)(4)(i)(a) (advertising "shall not recommend or suggest any use that is not in the labeling"); 62 Fed.Reg. at 64076 ("[T]he agency interprets the term 'advertisement' to include information (other than labeling) that originates from the same source as the product and that is intended to supplement or explain the product.").

tion. On this challenge, too, count two must be sustained.

Finally, Caronia contends that he did not misbrand Xyrem in his conversations with the cooperating physician in October and November 2005. He attaches the government's transcripts of those conversations and claims that at no time did he actually promote Xyrem for off-label uses. On motion to dismiss, however, the Court must follow the well established rule that allegations of fact in the information be accepted as true and contrary assertions of fact by the defendant not be considered. *See Blasius,* 230 F.Supp. at 997; *Goldberg,* 756 F.2d at 950. The Court therefore declines to look beyond the facts alleged by the government in the information supporting the charge of Caronia's alleged misbranding. Such disputes are resolved by trial not motion.

For all these reasons and upon each of the grounds asserted on this branch of the motion, the Court denies Caronia's motion to dismiss count two of the information.

### III. *Constitutionality of the Misbranding Charges under the First Amendment*

By reference to former co-defendant Gleason's motion to dismiss the prior indictment filed against Gleason and Caronia, Caronia argues on this second branch of his motion that the misbranding provisions of the FDCA as applied to his alleged conduct are an unconstitutional restriction of speech under the First Amendment. Reduced to its essence, Caronia's argument is that the government cannot restrict truthful, non-misleading promotion by a pharmaceutical manufacturer (or its employees) to a physician of the off-label uses of an FDA-approved drug. The government rejoins that the First Amendment does not apply to Caronia's activities as alleged in the information and that, if the First Amendment does apply, the FDCA's restrictions on promotion of off-label uses are constitutional.

■ Squarely, Caronia's constitutional attack calls into question America's regulatory regime for the approval and marketing of prescription drugs. The argument is founded on the unassailable fact that, under current law, while it is unlawful for a manufacturer to promote to physicians or consumers off-label uses of a prescription drug approved by the FDA for other uses, a physician may nonetheless *lawfully* prescribe that drug for *any* purpose, regardless of whether that purpose has been approved. *See Washington Legal Foundation v. Henney,* 202 F.3d 331, 332–33 (D.C.Cir.2000). It is generally recognized (even by the FDA) that off-label prescriptions can constitute a medically recognized standard of care and, therefore, that it is important for physicians to have access to accurate information about off-label uses.[6] Thus, "[t]hese 'off-label uses' being lawful, the argument goes, it must also be lawful to tell customers about them." *United States v. Caputo,* 517 F.3d 935, 938 (7th Cir.2008).

The seminal case on the FDA's regulation of guidance relating to the off-label use of prescription drugs is Judge Lamberth's decision in *Washington Legal Foundation v. Friedman,* 13 F.Supp.2d 51, 74–75 (D.D.C.1998), *order vacated as moot sub nom. Washington Legal Foundation v. Henney,* 202 F.3d 331, 336–37 (D.C.Cir.

---

6. *See, e.g.,* FDA Draft Guidance, *supra* note 5, at 4 ("[O]ff-label uses or treatment regimens are important and may even constitute a medically recognized standard of care."); *id.* at 6 ("[T]he public health can be served when health care professionals receive truthful and non-misleading scientific and medical information on unapproved uses of approved or cleared medical products[ ]").

2000) (referred to *infra,* as *Friedman*), which opined that FDA guidances restricting certain forms of manufacturer promotion of offlabel uses were unconstitutional restrictions of commercial speech under the First Amendment.[7]

The constitutional cause was re-ignited in *United States v. Caputo,* 288 F.Supp.2d 912, 922 (N.D.Ill.2003), which rejected a First Amendment challenge to the misbranding provisions of the FDCA. On appeal, however, the Seventh Circuit, affirming the decision below on a nonconstitutional ground, noted in *dicta* and in contradistinction to the district court's opinion that recent Supreme Court commercial speech cases suggested that the provisions challenged below may be unconstitutional in at least some applications. *See Caputo,* 517 F.3d at 939 (citing *Thompson v. Western States Medical Center,* 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002)). In short, the constitutional issues raised in Caronia's motion are very much unsettled, not only in this circuit but nationwide.

### A. Whether the Information Alleges Speech or Conduct

As a threshold matter, the government argues here that the First Amendment is not implicated at all because the information alleges only "illicit conduct which is achieved, in part, through the use of commercial speech." Caronia's "speech" is used, the government says, only to establish the element of intent and to establish motive. The government compares this case to *Whitaker v. Thompson,* 353 F.3d 947 (D.C.Cir.2004). In *Whitaker,* the D.C. Circuit found that the FDA did not violate the First Amendment's restrictions on commercial speech when it determined that a certain dietary supplement had to be approved as a drug before it could be marketed as effective in the treatment of a disease. *Id.* at 952–53. Citing *Wisconsin v. Mitchell,* 508 U.S. 476, 489, 113 S.Ct. 2194, 2201–02, 124 L.Ed.2d 436 (1993), the D.C. Circuit held that it was permissible for the FDA to use the manufacturer's speech in its labeling to infer intent for purposes of determining whether the substance was a "drug" requiring prior approval before it could be marketed as proposed. *Id.* at 953; *accord United States v. Gen. Nutrition, Inc.,* 638 F.Supp. 556, 562 (W.D.N.Y.1986). By its analogy to *Whitaker,* the government argues that Caronia's promotion, even if it was speech, can serve as evidence of Xyrem's "intended use" and establish criminal misbranding.

---

7. In the primary opinion cited here, Judge Lamberth permanently enjoined the FDA from enforcing three of its guidance documents that expressed FDA policies as to when a manufacturer's activities in these contexts would violate the FDCA. *See Friedman,* 13 F.Supp.2d at 74–75. In a subsequent opinion, the district court reiterated that the order applied to the underlying FDA policies, not just to the guidance documents themselves. *See Washington Legal Foundation v. Friedman,* 36 F.Supp.2d 16, 19 (D.D.C.1999). After supplemental briefing on issues raised by the recently enacted Food and Drug Administration Modernization Act ("FDAMA"), 21 U.S.C. §§ 360aaa and its implementing regulation, 21 C.F.R. § 99, which perpetuated in part and modified certain of the policies contained in the guidance documents, the court issued another opinion in which it held portions of the statute and regulation to be unconstitutional. *See Washington Legal Foundation v. Henney,* 56 F.Supp.2d 81, 87–89 (D.D.C.1999). On appeal, the FDA took the position that the off-label speech restrictions in the FDAMA and remaining guidance established only a "safe harbor", i.e., a procedure for manufacturers to distribute these materials without facing prosecution under the misbranding provisions of the FDCA. *Henney,* 202 F.3d at 336–37. As a result, WLF agreed that it no longer had a constitutional objection to the FDAMA or guidance document and, accordingly, the D.C. Circuit dismissed the appeal and vacated the district court's injunction. *Id.*

The argument, however, overlooks case law which has generally rejected the notion that promotion of an approved drug is conduct, as opposed to speech within the ambit of the First Amendment. Judge Lamberth's opinion in *Friedman*, for one, explicitly rejected the idea that off-label promotion was unprotected conduct. *See Friedman*, 13 F.Supp.2d at 59 ("This court is hard pressed to believe that the [FDA] is seriously contending that 'promotion' of an activity is conduct and not speech, or that 'promotion' is entitled to no First Amendment protection."). Although the D.C. Circuit vacated as moot the injunctive relief ordered by the district court, the court of appeals strayed far from its holding to note in *dicta* that a "manufacturer, of course, may still argue that the FDA's use of a manufacturer's promotion of off-label uses as evidence in a particular enforcement action violates the First Amendment." *Henney*, 202 F.3d at 336 n. 6. More powerfully, in an analogous context, the Supreme Court in *Western States*, 535 U.S. at 366, 122 S.Ct. at 1503, analyzed pharmaceutical advertising of compounded drugs that were not FDA approved, but could be lawfully sold by pharmacists, as protected commercial speech and stifled FDA efforts to restrict it.[8]

■ In line with these cases, it is clear to the Court that the promotion of off-label uses of an FDA-approved prescription drug is speech, not conduct. At the very least, *Whitaker* and similar cases may be confined to the particular context of restrictions on the marketing of drugs or medical devices that are not approved for *any* use, rather than the marketing of off-label uses of drugs and devices that have been FDA-approved and can be prescribed by a health care practitioner with dispensing authority. *Accord Caputo*, 517 F.3d at 940 (avoiding the First Amendment question where medical device had not been approved for any use and thus "there were no lawful off-label uses to promote."). Simply stated, as the criminal information here alleges Caronia's promotion of off-label uses of an FDA-approved drug, it cannot survive First Amendment scrutiny based solely upon the government's claim that the alleged activities constitute conduct as opposed to speech.

## B. Whether the Information Alleges "Pure" or Commercial Speech

Caronia's instant motion to dismiss appropriates an alternative First Amendment argument advanced by Gleason prior to his guilty plea. Because he was a doctor expressing his opinions about a drug he could and did prescribe, Gleason argued that his promotional activities amounted to scientific and academic speech, which resides at the core of the First Amendment and, therefore, should receive the highest constitutional protection as pure speech. *See, e.g., Keyishian v. Bd. Of Regents*, 385 U.S. 589, 603–04, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967). Caronia, perhaps

---

8. Indeed, the proposition has been advanced that *Western States* now forecloses any argument that manufacturer promotion of off-label uses of FDA-approved drugs constitutes conduct, not speech. *See* A. Elizabeth Blackwell & James M. Beck, *Drug Manufacturers' First Amendment Right to Advertise and Promote Their Products for Off–Label Use: Avoiding a Pyrrhic Victory*, 58 Food & Drug. L.J. 439, 445–46 (2003) ("After *Western States*, FDA can no longer assert that its use of speech as a proxy for conduct is exempt from First Amendment scrutiny. Its use of speech to determine when a regulated drug or device will be treated as 'new' for purposes of drug approval requirements ... or as 'misbranded' for purposes of enforcing 21 U.S.C. § 352(f),—rather than some other benchmark—must survive exacting First Amendment standards."); *see also Caputo*, 517 F.3d at 939 (7th Cir.2008) (*"Western States Medical Center* establishes that drugs are not a special case for first-amendment analysis.").

recognizing that such an argument would be of little help to him as a sales representative of the manufacturer, does not press the argument that his own speech was "pure" speech. He advances instead the alternate argument Gleason advanced that such promotional activities, if not "pure" speech, are protected at minimum as commercial speech.

■ Under the three-factor test set forth in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66–68, 103 S.Ct. 2875, 2879–81, 77 L.Ed.2d 469 (1983), to determine whether a promotional activity is protectable as "commercial speech", a court must look to (1) whether the expression is an advertisement; (2) whether it refers to a specific product; and (3) whether the speaker has an economic motivation for speaking. In *Friedman*, Judge Lamberth found that manufacturer sponsorship of continuing medical education ("CME") seminars and distribution of reprints from peer-reviewed medical journal articles and commercially-available medical textbooks (so-called "enduring materials") was commercial speech. *Friedman*, 13 F.Supp.2d at 62–65. Noting the "commonsense" distinction between speech proposing a commercial transaction and other varieties of speech, *Friedman* found as to each of the *Bolger* factors: (1) that the materials and seminars were "advertisements" because they encouraged physicians to prescribe the drug; (2) that they referred to a specific product; and (3) that there was clear economic motivation behind the manufacturer's activities. *Id.* at 64. Furthermore, although the prescription drug industry presented a different context than traditional forms of consumer advertising, it was clear that the speech to doctors was intended to drive sales of the products because, "to the extent that physicians are the gatekeepers to sales, the marketing efforts must be directed at them." *Id.* at 63.

■ Here, the same analysis applies in spades to Caronia's speech as it is alleged in the information. Regardless what else might have been covered in his discussions, Caronia's alleged speech was made on behalf of the manufacturer and clearly (1) encouraged physicians to prescribe Xyrem, (2) referred to a specific product, and (3) was economically motivated. Any such promotion by Caronia to physicians on behalf of Xyrem's manufacturer of the drug's off-label uses would be commercial speech and be "entitled to the qualified but nonetheless substantial protection accorded to commercial speech." *Bolger*, 463 U.S. at 68, 103 S.Ct. at 2881.[9]

### C. The *Central Hudson* Test

■ Finding that Caronia's alleged promotional activities in marketing Xyrem constitute commercial speech, the Court must now address his argument that his speech specifically is constitutionally protected. *Central Hudson Gas v. Public Service Commission of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), which articulates a four-part test for determining whether commercial speech is protected by the First Amendment, is controlling. *See Western States*, 535 U.S. at 367, 122 S.Ct. at 1504. First, as a threshold matter, the Court must determine whether Caronia's commercial speech "concerns unlawful activity or is

---

**9.** *See* Ralph F. Hall & Elizabeth S. Sobotka, *Inconsistent Government Policies: Why FDA Off–Label Regulation Cannot Survive First Amendment Review Under Greater New Orleans*, 62 Food & Drug L.J. 1, 15 (2007) ("The limited judicial review of the constitutionality of restrictions on off-label promotion of drugs or devices has assumed or readily found that the speech in question is commercial speech, and even most opponents of off-label speech restrictions have accepted that categorization. Any other pathway leads to almost complete protection for any off-label speech.").

misleading." *Id.* If so, then the speech is not protected. *Id.* If the speech concerns lawful activity and is not misleading, then the Court asks: (2) "whether the asserted government interest is substantial"; (3) whether the restriction "directly advances the government interest asserted"; and (4) whether the restriction is "not more extensive than necessary to serve that interest." *Id.* (internal citations and quotation marks omitted); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 561, 121 S.Ct. 2404, 2425, 150 L.Ed.2d 532 (2001) (under the fourth prong, government must demonstrate a "reasonable fit between the means and ends" of the questioned commercial speech restriction). Each of the last three requirements must be met in order for the restriction to pass constitutional muster, and the government "carries the burden of justifying it." *Edenfield v. Fane*, 507 U.S. 761, 770–71, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993) (internal citations and quotation marks omitted).

### 1. The Speech Concerns Lawful Activity and Is Not Inherently Misleading

Under prong one of *Central Hudson*, the Court finds, in harmony with the analysis in *Friedman* and the district court's opinion in *Caputo*, that promotion of the off-label uses of a FDA-approved drug concerns lawful activity and is not inherently misleading.

First, promotion of off-label usage does not promote unlawful activity. *Friedman*, 13 F.Supp.2d at 66. "The proper inquiry is not whether the speech violates a law or a regulation, but whether the conduct that the speech promotes violates the law." *Id.* Here, the conduct that the speech promoted is the prescription of Xyrem for off-label uses, which the government concedes is lawful. As such, the promotional speech

the information alleges Caronia engaged in concerns lawful activity under prong one.

■ Second, the Court finds that the alleged speech is not misleading. As noted in *Friedman:*

> [T]he speech must be inherently misleading, which is defined in *Central Hudson* as more likely to deceive the public than to inform it. Whether speech is inherently misleading depends upon, *inter alia*, the possibilities for deception, whether experience has proven that in fact that such advertising is subject to abuse, and the ability of the intended audience to evaluate the claims made.

*Id.* at 66–67 (internal citations and quotation marks omitted). Promotion of off-label uses is not inherently misleading *simply* because the use is off-label. *See id.* at 67 ("In asserting that any and all claims about the safety, effectiveness, contraindications, side effects and the like regarding prescription drugs are presumptively untruthful or misleading until the FDA has had the opportunity to evaluate them, FDA exaggerates its overall place in the universe."). At this stage of the case, it is not clear what sorts of disclaimers and disclosures Caronia provided when promoting off-label uses; however and critically, the information does not allege that Carnonia claimed that the uses he was promoting were FDA-approved. *Accord Caputo*, 288 F.Supp.2d at 921. Further, adopting Judge Castillo's holding in *Caputo* and making it the finding here, "[Caronia's] speech was directed at physicians who are familiar with the FDA-approval process and able to independently evaluate the validity of their claims. Given the sophistication of the audience to whom the off-label uses were promoted, this Court cannot conclude, at this stage of the pro-

ceedings, that [defendant's] speech was inherently misleading." *Id.* As the first prong is satisfied, the government must satisfy *Central Hudson's* second prong.

## 2. The Government Has a Substantial Interest in Restricting Manufacturer Promotion of Off–Label Uses

The question as to whether the government has a substantial interest in restricting manufacturer promotion of off-label uses was addressed at some length in *Friedman,* which held (1) that the government clearly had a substantial interest in promoting the health and safety of its citizens, and (2), in furtherance of that objective, the government had a substantial interest in compelling manufacturers to get off-label treatments on-label. *Friedman,* 13 F.Supp.2d at 69–71. The *Friedman* court rejected any claim, however, that speech restrictions could be justified based merely on the fear that physicians would misuse the information provided to them. *Id.* at 69–70. But, while a "paternalistic assumption that the public will use truthful, non-misleading commercial information unwisely cannot justify a decision to suppress it[,]" *id.* (citing *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 497, 116 S.Ct. 1495, 1505, 134 L.Ed.2d 711 (1996)), it also does not extinguish or diminish the government's substantial interest in subjecting off-label uses of a drug or medical device to the FDA's evaluation process. *See id.* at 70–71; *accord Caputo,* 288 F.Supp.2d at 921; *Western States,* 535 U.S. at 369, 122 S.Ct. at 1505 ("Preserving the effectiveness and integrity of the FDCA's new drug approval process is clearly an important governmental interest, and the Government has every reason to want as many drugs as possible to be subject to that approval process."). As with the first, the second prong of Central Hudson has also been satisfied.

## 3. Restricting Manufacturer Promotion of Off–Label Uses Directly Advances the Substantial Governmental Interest

The district court opinions in *Friedman* and *Caputo* help fashion this Court's conclusion with respect to the third prong. Those courts found that restricting manufacturer promotion of off-label uses directly serves the substantial governmental interest in requiring manufacturers to submit supplemental applications to obtain FDA approval for new uses of previously approved drugs.

> It is clear that manufacturers have incentives to circumvent approval requirements, but one wonders what incentives they have to obtain them? For a brand-new drug, the incentive is simple: the pharmaceutical company cannot manufacture or introduce the drug into interstate commerce without FDA approval. However, the drugs subject to off-label prescriptions are *already* in interstate commerce, so the obvious restriction on conduct is unavailable. Therefore, one of the few mechanisms available to FDA to compel manufacturer behavior is to constrain their marketing options; i.e. control the labeling, advertising, and marketing.

*Friedman,* 13 F.Supp.2d at 72 (internal citations omitted; emphasis original); *see Caputo,* 288 F.Supp.2d at 921. In line with these authorities, this Court holds that the FDCA's prohibitions on commercial speech of the kind charged in the information filed against Caronia directly advance the government's interest in subjecting off-label uses of a drug like Xyrem to the FDA's evaluation process. *Central Hudson's* third prong is satisfied here as well.

### 4. The FDCA's Restrictions on Manufacturer Promotion of Off–Label Uses are Not More Extensive Than Necessary

With that the overture ends and the play begins. Enter on stage the essential question—can the government satisfy the fourth prong of *Central Hudson?*

*Friedman* is the well-spring; analysis starts there with Judge Lamberth's opinion which addressed the constitutionality of three FDA guidance documents that outlined factors the FDA would consider in deciding whether manufacturer (1) sponsorship of CME seminars and (2) distribution of textbook articles and article reprints from medical and scientific journals about off-label uses constituted unlawful off-label promotion. *Friedman*, 13 F.Supp.2d at 57–58. In considering prong four of *Central Hudson*, Judge Lamberth found that the FDA guidance documents at issue were more extensive than necessary to serve the government's interest in subjecting off-label uses to the FDA's evaluation process. *Id.* at 73. The court found further (and explicitly) that there were less-burdensome alternatives available to the FDA, including simply requiring full, complete, and unambiguous disclosure by the manufacturer of its involvement in the subject activities and the fact that the uses discussed were off-label. *Id.* Significantly, however, the court also found that, even though the FDA guidance documents were themselves unconstitutional, there remained adequate incentives to compel manufacturers to get off-label uses approved. *Id.* For instance, the FDCA would still prohibit distribution by the manufacturer or its agents of internally-produced marketing materials to physicians concerning off-label uses, involvement with non-independent seminars, initiation of person-to-person-contact with a doctor about off-label use, and advertising off-label uses directly to the consumer. *Id.* Thus, the court observed: "Were manufacturers permitted to engage in *all* forms of marketing of off-label treatments, a different result might be compelled[,]" *id.* (emphasis original), that is, an acknowledgment of the possibility of a constitutionally permissible restriction on commercial speech promoting the off-label use of an approved prescription drug.

*Caputo*, by contrast, involved not a challenge to a specific FDA guidance document but, rather, the statutory misbranding provisions of the FDCA. The indictment in that case alleged misbranding violations arising out of the defendants' promotion of off-label uses of a medical device, similar to the charges at issue in this case. *Caputo*, 288 F.Supp.2d at 919. Unlike in *Friedman*, however, the *Caputo* district court found that the defendants' First Amendment challenge "strikes at the very heart of the FDA's ability to proscribe manufacturer promotion of off-label uses." *Id.* at 922. Citing the *dicta* in *Friedman* about the constitutionality of restricting some forms of off-label promotion, the court held that "permitting Defendants to engage in *all* forms of truthful, non-misleading promotion of off-label use would severely frustrate the FDA's ability to evaluate the effectiveness of off-label uses." *Id.* (emphasis original). More importantly, the Caputo court was unable to identify a less burdensome alternative that would advance the government's substantial interest. *Id.* Consequently, it held that the restrictions were not more extensive than necessary under prong four of Central Hudson, and refused to dismiss the misbranding charges of the indictment on constitutional grounds. *Id.*

On appeal, the Seventh Circuit affirmed the convictions of the *Caputo* defendants, but determined, based on the particular facts of the case, that—"fortunately"—it

did not need to reach the constitutional issue the district court felt constrained to reach. *See Caputo*, 517 F.3d at 940.[10] In *dicta*, the Seventh Circuit did note, nonetheless, that the Supreme Court's decision in *Western States*, which had struck down a ban on pharmaceutical advertising of lawfully compounded drugs, had established the principle that prohibiting manufacturers from alerting consumers to lawful off-label uses is unconstitutional "in at least some applications." *Id.* at 939 (citing *Western States*, 535 U.S. 357, 122 S.Ct. 1497). The court of appeals then went on to say that whether the analysis in *Western States* and prior cases would apply to "promotion by a product's manufacturer, which struck a bargain with the FDA in the approval process by promising to limit its promotion—a bargain that the private litigants in the earlier cases had not struck—is a difficult question." *Id.* The court next discussed a practical quandary. On the one hand, it observed, if off-label use of a drug or device could be discussed freely by others, it clearly made sense to allow the manufacturer, which had the best information, to do it as well. *Id.* But, on the other, invalidating the misbranding provisions of the FDCA might cause the FDA to withhold approval of drugs or devices with questionable additional uses, which would hurt manufacturers with no desire to promote off-label uses and consumers who might be able to benefit from those uses. *Id.* at 939–40. Thus, the Seventh Circuit said, a "court should hesitate before extending an [ ][a]historical reading of the Constitution in a way that injures

the very audience that is supposed to benefit from free speech." *Id.* at 940.

Caronia's motion now demands answers to the questions raised but not resolved by the Seventh Circuit in *Caputo*. Building on the *dicta* in that case, he argues that *Western States* must be read to strike as unconstitutional any prohibition of a manufacturer's truthful promotion of off-label prescription drug usage. Caronia points out that in *Western States*, the Supreme Court struck down a ban on advertising by pharmacies of compounded drugs (drugs whose ingredients were tailored to the needs of individual patients) under the fourth prong of *Central Hudson*, despite the objective of Congress to draw a line between ordinary compounding (which was generally permitted as long as it was in response to a valid prescription) and large-scale manufacturing done in the guise of compounding, which would effectively circumvent the FDA's new drug requirements. *See Western States*, 535 U.S. at 369–71, 122 S.Ct. at 1505–06. In a 5–4 opinion the Court found, however, that Congress could have chosen a number of alternative paths to achieving that goal which would not have restricted the commercial speech rights of manufacturers, that is, that the government had therefore failed to carry its burden under the final prong of *Central Hudson*. *Id.* at 371–73, 122 S.Ct. at 1506–07. By analogy, then, Caronia argues that the government cannot ban manufacturer speech about off-label uses in order to ensure that manufacturers will pursue formal FDA approval of new uses.[11]

---

10. On the facts of that case, the jury had found that the device itself (which was a modification of an earlier approved device) could not be sold lawfully at all. *Caputo*, 517 F.3d at 940. In other words, the Seventh Circuit found, because the device had not been approved by the FDA for *any* purpose, "there were no lawful off-label uses to promote." *Id.* Consequently, since the commercial speech argument "rest[ed] on the assumption

that the law allows the activity that the speaker seeks to promote[,]" the defendants' convictions raised no constitutional issue on appeal. *Id.*

11. Caronia also suggests that restrictions on off-label speech must be limited only to those cases where companies are not already seeking to obtain FDA approval for an *off-label* use, or limited to cases where dangerous uses

This Court, however, finds more compelling the conclusion reached by the district court in *Caputo* that a First Amendment challenge by a drug or device-maker or its agents in such circumstances "strikes at the heart of the FDA's ability to proscribe manufacturer promotion of off-label use." *Caputo*, 288 F.Supp.2d at 922. As recognized in *Friedman*, constraining the marketing options of manufacturers is one of the "few mechanisms available" to the FDA to ensure that manufacturers will not seek approval only for certain limited uses of drugs, then promote that same drug for off-label uses, effectively circumventing the FDA's new drug requirements. *See Friedman*, 13 F.Supp.2d at 72. Indeed, the fact that the FDA retained *some* control over manufacturer marketing of off-label uses through the FDCA's misbranding provisions—control that is central to the instant prosecution—was crucial to Judge Lamberth's determination that the FDA guidances restricting manufacturer sponsorship of seminars and distribution of "enduring materials" were more extensive than necessary. *Id.* at 73. In other words, unlike in *Western States*, where neither logic nor the government had ex-

plained why restricting advertising was a "necessary as opposed to merely convenient" way to achieve its ends, here, the FDA's maintaining through the FDCA's misbranding provisions *some* control over the off-label promotion of manufacturers does appear essential to maintaining the integrity of the FDA's new drug approval process. Furthermore, unlike in *Western States*, this Court is unable to identify non-speech restrictions that would likely constrain in any effective way manufacturers from circumventing that approval process. *Accord Caputo*, 288 F.Supp.2d at 922.[12] Simply put, Caronia asks this Court to extend *Western States* to undermine the delicate balance between ensuring the integrity of the new drug approval process while allowing patients to continue to have unfettered access to new and potentially life-saving uses for drugs and devices approved only for other purposes. As the Seventh Circuit recognized, such a result could very well leave the FDA only with options that would injure the very audience that would purportedly benefit most from the speech at issue. *Caputo*, 517 F.3d at 940. The Court is disinclined to do so. Quite to the contrary, the Court con-

of a drug were being promoted. Caronia contends that the Xyrem promotional activities which are the subject of the criminal information were only for uses such as fibromyalgia for which Orphan *was* seeking approval at the time and, further, that the subject uses were not dangerous to users' health. Unfortunately, Caronia's argument in this regard once again asks this Court to look beyond the facts as alleged in the information, which is not permitted. *See Blasius*, 230 F.Supp. at 997.

12. The Court is aware that some commentators have suggested non-regulatory alternatives for Congress to incentivize manufacturers to seek FDA approval for new uses, including changes to the tort law, tax code, Medicare/Medicaid policies and /or patent law. *See generally* Hall & Sobotka, *supra* note 9, at 44–46. No one, including Caro-

nia, has pointed to any regulatory proposal FDA could adopt to plug the loophole in the new approval process that would be created if restrictions on manufacturer promotion of off-label use of the kind allegedly conducted by Caronia were to be struck down as unconstitutional restrictions on commercial speech. Importantly, too, prong four of *Central Hudson* does not require the government to choose the "least restrictive means" but, rather, requires only a "reasonable fit" between means and ends, a means "narrowly tailored to achieve the desired objective." *Lorillard Tobacco*, 533 U.S. at 556, 121 S.Ct. at 2422 (internal citations and quotation marks omitted). The Court finds that the challenged restrictions on the post-approval marketing of a drug, as applied to this case, are narrowly tailored to the goal of maintaining the integrity of the drug approval process.

cludes, based on case law and the facts alleged in the information which must be presumed true at this point, that the prohibitions on the speech which underlie the two counts in which Caronia is charged pass constitutional muster under the fourth prong of *Central Hudson.* Any right Caronia had as Xyrem's sales representative to express as commercial speech the truthful promotion of Xyrem's off-label uses is not unconstitutionally restricted by the misbranding provisions of the FDCA. On this ground,

Caronia's motion is also denied.

### D. First Amendment Overbreadth

 Caronia argues further by reference to Gleason's earlier motion that the misbranding provisions of the FDCA are unconstitutionally overbroad. The argument is without merit. It is well established that the overbreadth doctrine generally does not apply in the context of commercial speech. *See Bates v. State Bar of Arizona,* 433 U.S. 350, 381, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977); *see also Allstate Ins. Co. v. Serio,* 261 F.3d 143, 153 n. 16 (2d Cir.2001). As the Court has already determined, there can be no question that such off-label promotion *is* commercial speech as opposed to "pure"

speech. As a result, the overbreadth doctrine does not apply.

 Even if the doctrine were to apply, however, the overbreadth of a statute must "not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep. We will not topple a statute merely because we can conceive of a few impermissible applications." *Massachusetts v. Oakes,* 491 U.S. 576, 595–96, 109 S.Ct. 2633, 2644, 105 L.Ed.2d 493 (1989) (quoted in *United States v. Rybicki,* 354 F.3d 124, 130 n. 2 (2d Cir.2003)). The concerns raised by Gleason in his original motion rested largely on the term "representative"—in particular, whether doctors with financial connections to manufacturers would be chilled from otherwise permissible off-label speech for fear of provoking an "intended use" enforcement action. At most, however, the Court finds that such concerns amount only to a "few impermissible applications" that would rest largely on a strained interpretation of the term "representative". Given Caronia does not raise any other impermissible implications that might trigger overbreadth concerns, the Court finds that the misbranding provisions of the FDCA at issue in this information are not overbroad.[13]

---

**13.** In addition to asserting First Amendment overbreadth in his now-mooted motion to dismiss, Gleason also asserted both an as-applied and facial vagueness challenge to the misbranding provisions of the FDCA. Caronia does not appear to press any vagueness challenge in his current motion to dismiss. Assuming he has, the Court also finds such a claim to be without merit. Accepting the allegations of the information as true, Caronia cannot persuasively claim that he "could not reasonably understand that his contemplated conduct [was] proscribed" by the statute in order to support an as-applied vagueness challenge. *Parker v. Levy,* 417 U.S. 733, 757, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974). As to facial vagueness, "where First Amendment overbreadth analysis is not available, a statute will be held unconstitutionally vague

'on its face' only if it is unconstitutionally vague as applied to all circumstances", or where it is "permeated with vagueness." *United States v. Rybicki,* 354 F.3d 124, 130–31 (2d Cir.2003) (internal citations and quotation marks omitted). Courts, though, have repeatedly upheld the constitutionality of the misbranding provisions of the FDCA in the face of vagueness challenges, thus refuting any argument that the statute is facially vague. *See United States v. Sullivan,* 332 U.S. 689, 695, 68 S.Ct. 331, 335, 92 L.Ed. 297 (1948); *United States v. Travia,* 180 F.Supp.2d 115, 123 (D.D.C.2001); *see also Gen. Nutrition,* 638 F.Supp. at 564 ("[T]his Court is unaware of any case holding any provision of the Act void for vagueness in any circumstance").

## VI. Whether Caronia Conspired to Misbrand Xyrem

Finally, Caronia argues that, even accepting the factual allegations of the information as true, he did not conspire to misbrand Xyrem under either 21 U.S.C. 331(a) or (k) and, therefore, count one of the information must be dismissed. Caronia points out that he is accused of conspiring with Gleason to misbrand Xyrem and submits, therefore, that the Court must separately decide whether Gleason's own speech was protected or otherwise exempt under the FDCA. Stated differently, Caronia argues, if Gleason could lawfully promote off-label uses of Xyrem, then Caronia could not be guilty of conspiring with Gleason. Further, Caronia argues, he could not be guilty of conspiring with the cooperating physician under "Wharton's Rule", which holds that "[a]n agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." *See United States v. Bommarito,* 524 F.2d 140, 143 (2d Cir.1975) (quoting 1 Anderson, *Wharton's Criminal Law and Procedure* § 89, at 191 (1957)). It is Caronia's contention that, under Wharton's Rule, he could not conspire with a government cooperator to misbrand Xyrem.

■ However, as the government points out, the conspiracy to misbrand Xyrem alleged in the information was among Caronia, Gleason, Orphan and other Or-

phan employees. *See United States v. Hartley,* 678 F.2d 961, 972 (11th Cir.1982) (corporation may conspire with its own agents, officers, and employees in violation of 18 U.S.C. § 371). Indeed, the government states that it intends to call at trial an Orphan supervisor who has already pled guilty to separate charges of misbranding to testify as to the conspiracy alleged in the instant information. Thus, given the multiplicity of alleged co-conspirators, the Court need not decide now whether any off-label promotion by just one of them, Gleason (who has also already pled guilty to charges of misbranding), is constitutionally protected to any degree greater than the speech of Caronia himself. Furthermore, although the Court doubts that Wharton's Rule would apply to a conspiracy between two persons to commit a misbranding violation,[14] even assuming *arguendo* that it did apply, the alleged participation of multiple parties in the conspiracy renders the rule inapplicable under the "third party exception." *See Bommarito,* 524 F.2d at 144. This argument provides Caronia no solace.

## CONCLUSION

For the foregoing reasons, Caronia's motion to dismiss each of the two counts of the information is denied in its entirety. The case is now ready for trial. Jury selection will commence September 29, 2008, upon consent previously given, be-

---

**14.** Wharton's Rule generally deals with offenses (such as adultery, incest, bigamy, and dueling) which require participation of two or more persons in the substantive crime, where "the immediate consequences of the crime rest on the parties themselves rather than on society at large," and where "the agreement that attends the substantive offense does not appear likely to pose the distinct kinds of threats to society that the law of conspiracy seeks to avert." *Bommarito,* 524 F.2d at 144 n. 3 (quoting *Iannelli v. United States,* 420 U.S. 770, 782, 95 S.Ct. 1284, 1292, 43 L.Ed.2d 616 (1975)). It is an "an exception to the general principle that a conspiracy and the substantive offense that is its immediate end do not merge upon proof of the latter" and it "has current vitality only as a judicial presumption, to be applied in the absence of legislative intent to the contrary." *Iannelli,* 420 U.S. at 781–82, 95 S.Ct. at 1292.

fore a United States Magistrate Judge at an hour and courtroom to be assigned.

SO ORDERED.